## The James Ives.[1]

## The Newport.

## Easton *v.* The James Ives and The Newport.

*(District Court, S. D. New York.  December 16, 1890.)*

COLLISION—STEAMER AND SAIL VESSEL—PARALLEL COURSES—CHANGE OF COURSE.

The tug N., with libelant's canal-boat on her port side, and projecting ahead of her, was on her way from Columbia stores, Brooklyn, to a point near Ellis island, in the harbor of New York. The schooner J. I. came down the East river in tow, was cast off opposite the Battery, and, with a fresh N. N. W. wind, shaped her course to go between Ellis and Bedloe's islands, starting from a position on the tug's starboard hand, and some 300–400 feet distant, and moving parallel with, and a little faster than, the tug. Owing to her greater leeway also, she was continually drawing nearer. When about a third of a mile east of Bedloe's island, the schooner suddenly put up her helm, and attempted to cross the bow of the tow, but collided with the canal-boat. Her excuse was that she was obliged to so maneuver to clear a ship anchored between Ellis and Bedloe's islands. The weight of evidence was that there was no vessel so anchored as to embarrass the movements of either vessel. *Held*, that the schooner's change of course was unjustifiable, and was the cause of the collision.

In Admiralty.  Suit to recover damages caused by collision.

*Hyland & Zabriskie*, for libelant.

*Robinson, Bright, Biddle & Ward*, for the Newport.

*Goodrich, Deady & Goodrich*, for the James Ives.

BROWN, J.  Towards evening on the 28th of May, 1890, as the libelant's canal-boat Charles J. Rowe, while on the port side of the steam-tug Newport, and projecting ahead of her, was being towed from the East river, bound for the scow permanently anchored as a landing place near Ellis island, she was run into by the schooner James Ives, bound from the battery down the bay, and sustained damages, to recover which the above libel was filed.  There is much conflict in the evidence as to the place of collision, whether it was near Bedloe's island, or at least a quarter of a mile above it; whether an anchored ship was in the way, so as to compel the schooner to change her course; and also as to the relative position of the two vessels as they came out of the East river.  The weight of probability, as well as of the direct evidence, is that the collision was not so near Bedloe's island as most of the libelant's witnesses state, but much above Bedloe's island, and at least half way up to Ellis island, and probably at least a third of a mile eastward of a line joining the two.  The tug was bound from Columbia stores, Brooklyn, for the scow above referred to, and had come along the northerly side of Governor's island.  The schooner had been towed by a tug down the East

[1]Reported by Edward G. Benedict, Esq., of the New York bar.

river, and was cast off about in mid-river, when opposite the Battery. When cast off, most of her sails were set, and, with a fresh wind from the N. N. W., she was soon under way, at a speed of 9 or 10 knots, heading between Ellis and Bedloe's islands. According to the testimony of her master, when she got under way the tug's bow was lapping the schooner's stern, and only about 75 feet distant. His answer so states, and says that their courses were converging by an angle of three points. The two proceeded for nearly a mile, he says, until they came so near to a ship anchored between Ellis and Bedloe's islands that the schooner could not come about, but, in order to avoid collision with the ship, he was forced to bear off towards the tug, and thus came into collision with the libelant's boat; the tug not having stopped and backed early enough to keep out of the way. The tug's witnesses assert, and in this they are corroborated by the libelant, that there was no ship at anchor in the immediate vicinity of the collision, or so situated as to embarrass the navigation of the schooner, or to prevent her continuing further on her course. Examination and comparison of the testimony compel me to accept in general the version of the collision given by the libelant and the tug's witnesses, rather than that given by the schooner. It is impossible that the schooner could have been navigated in such a manner, and in such relative positions to the tug, as her master claims. He says the tug was only about 75 feet away from him when he got under way; that he kept his first course for about three minutes, then luffed in all about two points, and thereafter continued on about a parallel course with the tug, until he was forced to bear away at the time of collision. The libel states that at first their courses were crossing by three points. If this were correct, and the boats were but 75 feet apart at the start, there would have been a collision in less than 15 seconds; if, on the start, their headings had varied a point only, and they were then only 75 feet apart, at a speed of 9 knots, there would have been a collision in less than half a minute. I have no doubt that the tug's witnesses are correct in estimating their distance apart as at least 300 or 400 feet; and, considering the uncertainty of estimates on the water, and the subsequent navigation, the distance was probably at least 600 feet, and possibly more. If the position of the tug was that indicated by some of her witnesses by the letter G on the chart, she must have been even twice that distance from the schooner. If they were 600 feet apart when the schooner started under sail, and their courses converged two points, as seems probable from the testimony, they would have approached within 200 feet in going about 1,000 feet, that is, in a little over a minute. In fact, both proceeded nearly a statute mile before the collision, i. e., for about seven minutes, and I have no doubt that the luff referred to was much less than a minute after the start, and when they were at least 200 or 300 feet apart. It is improbable that at any time while the vessels were proceeding upon nearly parallel courses, and before the schooner bore away to cross the bow of the tug, they were so near each other as 100 feet. The schooner was gaining slightly on

the tug, but at no time got fully ahead of her. They were undoubtedly gradually approaching each other sideways, through the greater leeway made by the schooner, although their headings were no doubt about the same, viz., about west.

The libelant's witnesses confirm those of the tug also as to the fact that the schooner was astern of the tug at the start. The master of the schooner says that soon after the start the bows of the tug were abreast of his cat-head; but if at any time the tug was apparently astern of the schooner, I am satisfied that it was while her sails were shaking, and before she had filled away. The mate says that when they started under sail they were about 100 yards west of a line running from Fort William to the Battery. At that time the tug was at least that distance to the westward of the fort, and probably more, and, being at least 400 or 500 feet away, there was no difficulty, so far as I can perceive, in the schooner's going astern of the tug at the start, with a fair wind, and a direct course down the bay. By not doing so, and by assuming, within a minute after starting, a course nearly parallel with the tug, the pilot of the tug was naturally misled as to the schooner's destination, and supposed that she was going to anchorage ground on the western shore. There is no doubt that it was the duty of the tug to keep out of the way of the schooner if their courses were crossing; but, from the fact that the schooner, at the start, did not take a course astern of the tug, as she might have done, and, irrespective of that, from the further fact that very soon after starting—so soon as scarcely to be distinguishable from coming up to the wind after first filling away—she took a heading not at all crossing that of the tug, but, if anything, rather more to the northward than the tug's heading, (as must necessarily be found from the long distance run almost side by side, as well as by the tug's testimony,) it is not a case of crossing courses at all, since the pilot of the tug did not know the schooner's destination, and was not chargeable with any knowledge that she desired to go to the southward. He was not called on to give way until he had notice of her intention, or her proximity became dangerous. The schooner by the same rule was required to keep her course. Instead of doing so, she filled away suddenly, and ran across the bows of the tug. This was the immediate and the proximate cause of the collision. If the anchored vessel was at that time so near as to force the schooner to a change of course, it must have been equally in the way of the tug; but from the other testimony I am satisfied that the schooner's change of course was not made in the immediate vicinity of any anchored ship. This case has no resemblance to that of a necessary tack by a sailing vessel when she has approached as nearly as is safe the side of a river, or some other obstruction, where a steamer must know that the change of course is necessary. If the anchored ship had been so near as to require such a maneuver by the schooner, its position moreover must have been seen in abundant time for the schooner to hail the tug, and to signify her intention to go to the southward. They had proceeded for some time within easy hailing distance, and yet no hail

or signal of any kind was given, and the schooner filled away without warning; thus immediately bringing on collision.    This, in any view of the case, whether the anchored ship was where it was claimed to be by the captain of the schooner or not, was inexcusable and reckless; and, as it was the immediate cause of the collision, the schooner must be held to blame.

I do not find in the evidence any indication that the tug did not do all in her power to avoid collision from the time the intention of the schooner was made known.    She had given several blasts of the whistle previously, because they were approaching near to each other, and, as soon as the schooner changed her course, the tug stopped and backed strong, thus very nearly avoiding collision.    When the schooner changed, they were probably from 100 to 200 feet apart.    Upon the evidence as above stated the case stands as that of vessels proceeding upon parallel courses, when the schooner, without previous notice of her intention, suddenly bore away across the bows of the tug without justification, and without any such evident or pressing necessity as the tug should have perceived without notice.    Upon such facts the schooner is alone in fault.    Decree for the libelant against the schooner, with costs, and dismissing the libel as to the Newport.